**SECOND DIVISION**
**RICKMAN, P. J.,**
**GOBEIL and DAVIS, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**April 8, 2025**

# In the Court of Appeals of Georgia

A25A0054. JACKSON v. THE STATE.

GOBEIL, Judge.

In July 2018, a Houston County jury found Dell Jackson, Jr., guilty of armed robbery and possession of a firearm during the commission of a felony. In *Jackson v. State*, 354 Ga. App. 225 (840 SE2d 609) (2020) ("*Jackson I*"), we reversed Jackson's convictions on the ground that he received constitutionally ineffective assistance of trial counsel based on counsel's failure to seek redaction of comments she made during Jackson's videotaped statement to police wherein she questioned the plausibility of Jackson's version of events. Id. at 228-230 (2). Following his retrial in June 2021, Jackson was again found guilty of armed robbery and possession of a firearm during the commission of a felony. In the instant appeal, Jackson argues that

the trial court erred by denying his motion for a mistrial and in overruling his *Batson*[1] challenge to the State's use of peremptory strikes during jury selection. For the reasons explained more fully below, we affirm.

Jackson does not challenge the sufficiency of the evidence supporting his convictions. Accordingly, "we review only the evidence presented at trial that is relevant to [Jackson's] enumerations of error and any factual background needed to provide context for them." *Eaker v. State*, 315 Ga. 202, 203 (1) (881 SE2d 673) (2022) (footnote omitted). The evidence included the following. In the early morning hours of July 18, 2016, after the victim's shift at the restaurant where he worked ended, he drove to an ATM, withdrew approximately $60 in cash, picked up a few items from a gas station convenience store, and headed home where he lived with his parents. He pulled into his driveway at approximately 2:30 a.m., and as he got out of his truck to close the gate, he noticed a gray Dodge Charger parked in the middle of the road in front of his driveway. As he neared the gate, the passenger in the car, later identified as Jackson, asked him for directions. After the victim gave him directions, Jackson, who was still in the vehicle, asked for a lighter. The victim retrieved a lighter from his

---

[1] *Batson v. Kentucky*, 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986).

truck, gave it to Jackson, and turned back toward the gate. At that point, Jackson got out of the vehicle and pointed a gun at the victim's head and ordered him to lie face down on the ground, and the victim complied. Jackson took the victim's wallet, which contained his driver's license, debit card, credit card, and cash. A street light right next to the driveway enabled the victim to get a good look at the perpetrator and the gun, which he described as "either a 9 millimeter or a .45." After the vehicle drove away, the victim ran inside his house and called 911. At the scene, police discovered a Virginia College lanyard with keys on it in the victim's yard. The perpetrators unsuccessfully attempted to use the victim's debit card at an ATM, and the driver, Brandon Clark, used the debit card to purchase gas from a gas station.

A BOLO was issued and a patrol officer tracked a vehicle matching the description given by the victim to the Brandon Court Apartments. The officer saw Clark exit the Dodge Charger and go into an apartment. The passenger, Jackson, got out of the car and ducked down beside it. The officer approached Jackson, she asked him what he was doing, and he explained that he was looking for his car keys. He described that the keys were on a Virginia College lanyard. The officer asked Jackson what he had been doing that night, and he told the officer he had been "having

relations" with a woman named Ashley. He did not mention any involvement in an armed robbery. He denied being in the Dodge Charger that evening, denied participating in an armed robbery, and did not mention anything about Clark forcing him to participate in a crime.

Police drove the victim to the apartment complex, and he identified Jackson as the man who had robbed him. Officers also brought the lanyard to the Brandon Court Apartments, and the keys on the lanyard opened a vehicle registered to Jackson. A silver, 9-millimeter pistol was discovered under the front passenger seat during a search of the Dodge Charger. Jackson was arrested that day and later charged by indictment with armed robbery (Count 1), financial transaction card theft (Count 2), and possession of a firearm during the commission of a felony (Count 3).

In September 2016, while in custody, Jackson asked to speak to the lead detective, Lieutenant Brett Rozier, to provide more information about the crimes. A recording of this interview was played for the jury at trial. In *Jackson I*, this Court described that in the interview,[2]

---

[2] Although the full interview was played for the jury in *Jackson I*, a redacted version of the video that excluded counsel's improper comments was played during Jackson's retrial.

Jackson explained that he was riding with Clark because Clark owed him $80 and asked if he wanted to ride with him to go pick it up. After driving Jackson to a house and leaving him outside for approximately 30 minutes, Clark came out with red eyes and a white substance in his nose. When Jackson asked Clark to take him to his car, Clark said, "I'm about to go get the money."

According to Jackson, Clark then drove to two banks and followed cars that had pulled away from an ATM before following the victim in this case. After following the victim to his home, Clark pulled out a chrome .45. When Jackson asked what it was for, Clark said "you're about to see." Jackson told him not to do it and to "chill." Clark rolled down the passenger side window beside Jackson and asked the victim a question. When the victim returned to his car, Clark tried to hand the gun to Jackson and told him "to go see what he got there." Jackson asked Clark to take him "to [his] car or [he] would get out and walk." After the victim closed his car door, Jackson felt Clark press the gun on his leg in a twisting motion and Clark told him again "to go see what he got." Jackson explained that at that moment, he knew Clark was serious and he took the chrome gun, got out of the car with it, and robbed the victim. From the moment Clark put the gun on his leg, Jackson was scared. As they were leaving the scene of the robbery, Jackson threw the victim's wallet and the chrome gun out the window. When questioned by the

detective, Jackson said that the gun held to his leg was [not the chrome gun but instead was] a small black gun that could fit in a pocket.[3]

Id. at 227.

Jackson testified in his own defense at the second trial. Jackson's testimony largely tracked the version of events he gave during his custodial interview, but he offered additional details on direct examination. In the recorded interview, Jackson denied saying anything to the victim, but at trial, Jackson conceded that he "guess[ed he] did make [the victim] get on the ground," before reaching in the victim's pocket and grabbing his wallet. When asked why he lied to the officers who responded to the Brandon Court Apartments, he claimed that he "wasn't in a reasonable state of mind," was "overwhelmed," and "just blacked out that night," and he attributed some of his actions to being under the influence of Xanax and alcohol. He described that he did not willingly rob the victim, but was forced to by Clark. Although he stated to Lieutenant Rozier in the interview that he did not remember pointing the gun at the victim, he admitted on cross-examination that "[t]hat was a lie."

---

[3] The police never recovered the small, black gun described by Jackson.

Clark also testified at trial.[4] Clark described that he and Jackson followed the victim from an ATM to his house. Although Clark claimed he could not remember many details surrounding the robbery, and he answered "maybe" to several of the prosecutor's questions, he denied unequivocally that he had pointed a gun at Jackson or forced him to participate in a robbery on the date in question.

Following deliberations, the jury returned a guilty verdict on Counts 1 and 3, and the trial court entered a judgment of conviction.[5] The trial court denied Jackson's motion for new trial, as amended, and this appeal followed.

1. Citing OCGA § 17-8-75, Jackson first argues that the trial court erred by failing to grant his motion for a mistrial, rebuke the prosecutor, or offer curative instructions after a screen in the courtroom displayed information referencing Jackson's previous trial. We discern no reversible error.

During the retrial, surveillance videos, including from the ATM where Jackson attempted to use the victim's debit card, were played for the jury. The videos were played from the prosecutor's computer, and an icon on this computer referenced a

---

[4] Clark entered a guilty plea to armed robbery in 2019 for his part in the crime.

[5] The State nolle prossed Count 2, which charged Jackson with financial transaction card fraud.

7

trial transcript from July 2018; this icon was visible to the jury just before each video was played. A member of the defense team noticed the icon's label, and the prosecutor immediately removed the information from the jury's view as soon as he was notified. Trial counsel then moved for a mistrial, which the court denied. Specifically, the trial court highlighted that the jurors had already been made aware that there had been a prior hearing[6] in the case by virtue of the defense's cross-examination of one of the responding officers. The court reasoned that a mistrial was not warranted because it was unlikely that the jurors "would even know or appreciate the difference between a hearing or a trial, much less would read into that that necessarily means that there was a prior jury trial in this case[.]"

"The abuse of discretion standard applies to the review of the denial by the trial court of a motion for mistrial." *Underwood v. State*, 218 Ga. App. 530, 534 (3) (462 SE2d 434) (1995). Under OCGA § 17-8-75:

---

[6] On the first day of trial, defense counsel placed on the record that she had instructed Jackson and the defense witnesses not to reference the previous trial, but to refer to it as a "previous hearing or something like that." The prosecutor likewise stated that he had instructed the State's witnesses to refrain from mentioning the prior trial.

Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender.

We review Jackson's argument that the trial court failed to meet its statutory duty under OCGA § 17-8-75 under the nonconstitutional harmless error test, which provides that "an error is harmless if the State shows that it is highly probable that the error did not contribute to the verdict, an inquiry that involves consideration of the other evidence heard by the jury." *Jackson v. State*, 317 Ga. 139, 144 (1) (891 SE2d 878) (2023) (citation and punctuation omitted); *Arrington v. State*, 286 Ga. 335, 345-346 (16) (a) (687 SE2d 438) (2009).

Here, Jackson admitted to robbing the victim while holding a gun, and the jury viewed surveillance footage of Jackson's attempt to use the victim's debit card at an ATM. The small black gun that Jackson claimed Clark used to coerce him to rob the victim was never recovered, and Clark denied forcing Jackson to rob the victim. To the extent that the inadvertent reference to the previous trial could be construed as

somehow a comment on Jackson's guilt, we are unpersuaded that any such passing reference contributed to the jury's verdict in this case given the overwhelming evidence of Jackson's guilt. *Williams v. State*, 301 Ga. 712, 717-718 (4) (804 SE2d 31) (2017). See *Fleming v. State*, 306 Ga. 240, 243 (2) (830 SE2d 129) (2019) (explaining that "[e]ven if we were to assume that the trial court erred in not rebuking the prosecutor under OCGA § 17-8-75, any such error was harmless" in light of the substantial evidence against the defendant).

2. Jackson contends that the trial court erred by denying his *Batson* challenge to the composition of the jury. We disagree.

> A *Batson* challenge involves three steps: (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven the proponent's discriminatory intent. A trial court's finding as to whether the opponent of a strike has proven discriminatory intent is entitled to great deference and will not be disturbed unless clearly erroneous.

*Moss v. State*, 366 Ga. App. 33, 35 (1) (879 SE2d 821) (2022) (citation and punctuation omitted).

In this case, the panel of 41 eligible jurors included 7 Black jurors. The State used four of its peremptory strikes to exclude Black jurors, and defense counsel lodged a *Batson* challenge. The trial court determined that the defense established a prima facie showing of racial discrimination. In response, the prosecutor explained his reasons for striking the prospective jurors, and the trial court found these reasons to be race neutral, and therefore overruled Jackson's *Batson* challenge.

At trial, Jackson challenged all four strikes against Black jurors as being discriminatory, but he argues with respect to only one prospective juror on appeal. This potential juror explained during voir dire that he was retired, a stay-at-home father, and indicated that he did not want to serve on the jury. Jackson claims the State's explanation for striking this prospect was mere pretext, with the goal of ensuring that as few minorities as possible would be seated on the jury.

"An explanation based on something other than the race of the juror is race-neutral unless a discriminatory intent is inherent in the explanation. Such explanation is not race-neutral if it is based on a characteristic peculiar to any race or on a stereotypical belief." *Wheeler v. State*, 249 Ga. App. 116, 117 (1) (547 SE2d 746) (2001) (footnotes omitted). Here, the State explained that it struck the prospect in

11

question because the juror "said that he was not employed and stayed at home" and had expressed that he did not want to serve on the jury. In response, defense counsel pointed out that the prospect was simply unemployed, but was retired from a lengthy military career and lived in a 5,000 square foot home. The trial court mentioned that it "[did]n't know if it's a good or a bad use of a peremptory strike," but nevertheless concluded that the reason was race-neutral and overruled the objection.

Given the totality of the circumstances, Jackson has failed to establish that the trial court's *Batson* ruling was clearly erroneous. The State's explanation in this case was race-neutral because it was based on a factor other than race. See *Jackson v. State*, 265 Ga. 897, 898 (2) (463 SE2d 699) (1995) ("a neutral explanation means an explanation based on something other than the race of the juror[; u]nless a discriminatory intent is inherent in the proponent's explanation, the reason offered will be deemed race neutral") (citation and punctuation omitted). Accordingly, "the trial court was bound to accept the explanation." *Leeks v. State*, 226 Ga. App. 227, 228 (3) (483 SE2d 691) (1997). Put another way, "[a] trial court may not simply reject the explanation on grounds that it is not credible or that it is whimsical. Rather, it must accept the explanation if it is facially neutral, then determine whether the challenger

can carry his burden of showing the given explanation is merely pretext for discrimination." Id. at 229 (3) (emphasis omitted). Here, Jackson has failed to offer any argument to support his contention that the State's explanation was pretextual, and has thus failed to satisfy his burden of demonstrating error in the trial court's *Batson* ruling. *Arrington*, 286 Ga. at 339-340 (9).

*Judgment affirmed. Rickman, P. J., and Davis, J., concur.*